NOT DESIGNATED FOR PUBLICATION

No. 124,513

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

ERIC WADE HARBACEK,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; DANIEL D. GILLIGAN, judge. Opinion filed April 22, 2022. Reversed and remanded with directions.

*Andrew R. Davidson*, deputy district attorney, *Thomas R. Stanton*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Shannon S. Crane*, of Hutchinson, for appellee.

Before BRUNS, P.J., CLINE, J., and JAMES L. BURGESS, S.J.

PER CURIAM: Police officers arrived at Eric Harbacek's residence after the wheelchair-bound owner of the house—who also resided there—called and informed the officers that Harbacek had kicked him in his collarbone. Harbacek, a parolee, was arrested at the residence. The police officers called Harbacek's parole officer, who gave them permission to search the basement where Harbacek resided. During the search, officers found methamphetamine, marijuana, two firearms, and shotgun shells. Harbacek later moved to suppress, arguing the officers violated statute authorizing the search because they failed to submit a written report to Harbacek's parole officer by the close of

1

the next business day following the search. The district court granted Harbacek's motion, after which the State filed this interlocutory appeal. We reverse and remand with directions.

FACTUAL AND PROCEDURAL BACKGROUND

Harbacek was paroled after serving time in prison. In October 2019, Harbacek signed a Conditions of Release for Parole and Post-Incarceration Supervision form. Harbacek's parole officer, Brett Richards, said the form is standard for individuals who have been released from prison and that it contained six standard conditions for parole, as well as any other special conditions. Richards called condition six the search condition, which contained two provisions. Under the second provision, Harbacek agreed to "[b]e subjected to a search of [his] person and [his] effects, vehicle, residence, and any other property under [his] control by any law enforcement officer based on reasonable suspicion of violation of conditions of post-incarceration supervision, or reasonable suspicion of criminal activity."

In January 2021, Harbacek lived in Larry Drummond's house in Hutchinson with Drummond's wife, stepdaughter, and grandson. Harbacek lived in the house sporadically for about four years and occupied the basement by himself. According to Drummond, "Nobody really went down there except [Harbacek] and I haven't been down there in years because of my disability."

On January 23, Drummond overheard his wife and Harbacek arguing in another room. Drummond got in his wheelchair and went to the room where the argument took place. When he entered the room, he yelled at Harbacek and told him to leave his wife alone. In response, Harbacek slammed the door in Drummond's face. Drummond opened the door, and Harbacek began arguing with Drummond. Harbacek kicked Drummond in his collarbone. Drummond called the police.

2

Police Officers Ian McIntire and Anthony Garcia were dispatched to Drummond's home. When McIntire arrived, he observed Harbacek standing by the back side of the garage. McIntire tried to make contact with Harbacek, but Harbacek shut the garage. McIntire then went inside the residence and interviewed Drummond. McIntire asked Drummond whether he required medical attention, and Drummond told McIntire he felt fine. Drummond then explained what happened and showed the abrasion on his collarbone. At some point, Harbacek was placed under arrest for domestic violence battery.

Following the investigation of the battery, Garcia contacted Richards and explained what occurred and that Harbacek had been placed under arrest for his actions. Based on this information, Richards believed Harbacek's actions constituted a violation of his parole and a suspicion of criminal activity. Richards did not go to Harbacek's residence, but he granted Garcia permission to search the residence by proxy. Richards gave permission because on a previous occasion, Harbacek threatened a person and admitted afterwards he had been using drugs and alcohol. Richards testified he planned to have Harbacek complete urinalysis testing based on what had occurred at the Drummond home, and Richards wanted to make sure there was nothing illegal in the residence. Richards did not receive the police report of the January 23 incident until January 29, 2021.

After receiving permission from Richards to search Harbacek's bedroom, Garcia accessed Harbacek's locked bedroom first with McIntire joining the search soon after. During the search, the officers discovered two Mason jars containing marijuana in Harbacek's closet. One of the Mason jars had a bag inside, which is where the marijuana was stored. That bag weighed 45.56 grams. The other Mason jar did not have a bag but contained raw marijuana. The officers did not remove the marijuana from the jar, but the combined weight of the marijuana and the jar was 648.8 grams. They also discovered a

3

baggie of white residue, which tested positive for methamphetamine. In a room adjacent to Harbacek's bedroom, officers discovered a Remington 870 Express Magnum shotgun and an American Tactical Omni Firearm. In a closed cabined just outside Harbacek's bedroom, officers discovered shotgun shells.

Drummond denied ownership of the firearms, stating that he cannot go downstairs due to his disability. Similarly, he said his wife only goes to the basement for Christmas decorations. Garcia knew which bedroom downstairs belong to Harbacek, but he could not recall what area of the house Richards authorized him to search. He also stated that anyone, aside from Drummond, had access to the downstairs area of the home.

A few days after these events, the State charged Harbacek with one count each of possession of marijuana with intent to distribute; possession of methamphetamine; possession of paraphernalia with intent to manufacture, plant, or cultivate marijuana; criminal possession of a firearm; use or possession with intent to use drug paraphernalia; and battery. In June 2021, Harbacek filed a motion to suppress, which the district court heard at the same time as the preliminary hearing in August the same year.

Near the conclusion of the hearing, the State conceded that it could not charge Harbacek with possession of 648 grams of marijuana with intent to distribute because the officers failed to remove the marijuana from the Mason jar before weighing it. Even so, the State asked the district court to bind Harbacek over for possession of marijuana with intent to distribute for the 45 grams of marijuana. Similarly, the State argued the district court should bind Harbacek over for criminal possession of a firearm.

Harbacek argued the statute that authorized the officers to search his room required a nexus between the criminal activity and the location the officers intended to search. He believed there had been no testimony or evidence he had been downstairs the day the events took place. Instead, he contended the testimony showed the entire

4

sequence of events took place upstairs. Harbacek also argued the officers violated the statute which required the officers to provide Richards with a written report no later than the close of the next business day following the search. Harbacek agreed with the State about the separate jars of marijuana—he believed he could not be charged with possession of the 648 grams of marijuana because the officers weighed the marijuana and Mason jar together instead of removing the marijuana from the jar and weighing it separately. Finally, Harbacek argued the firearms and shotgun shells were discovered outside his bedroom, which anyone inside the house had access to, apart from Drummond.

On rebuttal, the State argued the statute which authorizes the search did not require a nexus between the criminal activity and the place to be searched. Instead, the statute only required a reasonable suspicion of criminal activity. The State argued that Richards' permission also served as the basis for the search.

After hearing arguments, the district court ruled that the statute did not require a nexus between the criminal activity and the place to be searched, so reasonable suspicion of any crime is sufficient to invoke the statute allowing parole searches. However, the district court found that the officers violated the statute allowing the search because they failed to provide Richards with a written report by the close of the next business day following the search. The lack of compliance with the statute meant the officers lacked the authority to search Harbacek's bedroom. As a result, the district court dismissed the charges of possession of marijuana with intent to distribute; possession of methamphetamine; possession of paraphernalia with intent to manufacture, plant, or cultivate marijuana; and use or possession with intent to use drug paraphernalia because the State failed to establish probable cause of those charges. The district court found that probable cause supported the charges of criminal possession of a firearm and battery.

In September 2021, the State filed a motion to reconsider. The State argued it did not have notice to prepare an argument about the officers' technical noncompliance with the statute because the defendant's motion to suppress failed to allege such conduct could serve as a basis for suppression. Citing various cases, the State also argued that the officers' technical noncompliance with the statute did not trigger a violation to Harbacek's rights under the Fourth Amendment to the United States Constitution. Similarly, the State contended the search and seizure was not unreasonable, and the officers' failure to submit a timely written report did not violate Harbacek's rights because the search had been completed.

The district court held a hearing on the motion the next month. The district court started by distinguishing the arguments made and cases cited by the State from Harbacek's case. The district court then held the officers' noncompliance with the statute warranted suppression because Harbacek had no other recourse or remedy. The district court also concluded the written report requirement embodied in the statute was not only procedural, and the Legislature could—but did not—limit suppression by the language in the statute. At the end of the hearing, the district court denied the State's motion to reconsider. The district court also filed its written opinion the same day as the hearing.

The State timely filed an interlocutory appeal.

ANALYSIS

1. *Did the district court err in granting Harbacek's motion to suppress?*

On appeal, the State contends the district court erred in granting Harbacek's motion to suppress.

Generally, appellate courts apply a bifurcated standard of review on a motion to suppress, with factual findings reviewed for substantial competent evidence and legal conclusions reviewed under a de novo standard. When the underlying facts are undisputed, an appellate court focuses solely on the legal conclusions drawn from those facts, applying de novo review. *State v. Cash*, 313 Kan. 121, 125-26, 483 P.3d 1047 (2021). Likewise, this court exercises de novo review when presented with questions of statutory interpretation. See *State v. Stoll*, 312 Kan. 726, 736, 480 P.3d 158 (2021).

The Fourth Amendment to the United States Constitution states, in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." These same protections are guaranteed in the Kansas Constitution Bill of Rights, section 15. *State v. Toliver*, 307 Kan. 945, 949, 417 P.3d 253 (2018). "The touchstone of the Fourth Amendment is reasonableness. The Amendment does not protect against all searches and seizures. Rather it prohibits searches that are unreasonable, and whether a search is reasonable turns on the circumstances surrounding the search." 307 Kan. at 949. Under K.S.A. 22-3216(2), the State bears the burden of proving the search and seizure were lawful.

In *Toliver*, our Supreme Court dealt with an analogous situation. There, Toliver was placed on parole after his conviction for battery of a law enforcement officer. As part of his parole, he signed an agreement outlining the specific conditions he agreed to abide by. One of those conditions required him to allow parole officers to search his residence even if they did not have a search warrant and did not have cause to do so. Toliver's parole officer later visited his residence to verify his address. That officer—along with another Kansas Department of Corrections (KDOC) officer and three Riley County Police Department detectives—searched Toliver's apartment and found marijuana in his bedroom. Toliver was arrested and later charged with possession of marijuana.

7

Toliver later moved to suppress the marijuana, which the district court denied after deeming the KDOC's suspicionless search constitutional. After being found guilty of marijuana possession, Toliver appealed to the Kansas Court of Appeals, and the panel reversed the district court's ruling, finding that the language of K.S.A. 2014 Supp. 22-3717(k)(2) limited the authority of suspicionless searches to a parolee's person. As a result, the panel invalidated the parole agreement and concluded the search violated the Fourth Amendment. *State v. Toliver*, 52 Kan. App. 2d 344, 360, 368 P.3d 1117 (2016). The State later petitioned for review, which our Supreme Court granted.

Before deciding the issue, our Supreme Court acknowledged that "[t]he United States Supreme Court has held that parolees—along with probationers and prisoners—exist on a 'continuum of possible punishments,' all of which 'curtail an offender's freedoms' and diminish their reasonable expectation of privacy." 307 Kan. at 949 (quoting *Samson v. California*, 547 U.S. 843, 850-51, 126 S. Ct. 2193, 165 L. Ed. 2d 250 [2006]; *United States v. Knights*, 534 U.S. 112, 119, 122 S. Ct. 587, 151 L. Ed. 2d 497 [2001]). Our Supreme Court then summarized *Samson*, *Knights*, and *Griffin v. Wisconsin*, 483 U.S. 868, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987), because the United States Supreme Court determined the searches of the probationers and parolees in those cases may be supported by less than probable cause based on their limited expectation of privacy. *Toliver*, 307 Kan. at 949-52. After doing so, our Supreme Court concluded:

> "In sum, an authorizing state statute (or administrative regulation) presents one way in which a suspicionless search can withstand Fourth Amendment scrutiny. But it is not the only way. *Knights* remains good law, and a parole or probation condition in an agreement signed by the defendant can also establish a diminished privacy right.
>
> "Turning to Toliver's case, we apply the totality of the circumstances analysis announced in *Samson*—and acknowledged in [*State v. Bennett*, 288 Kan. 86, 96, 200 P.3d 455 (2009)]. That analysis requires balancing the degree to which the search intrudes upon an individual's privacy and the degree to which it is needed for the promotion of legitimate governmental interests. *Samson*, 547 U.S. at 848.

8

"Here, there are two salient circumstances impacting parolee Toliver's expectation of privacy—a parole agreement he signed and an authorizing state law. . . .

"As for the authorizing state law, under K.S.A. 2014 Supp. 22-3717(i), the prisoner review board had authority to 'impose any condition they deem necessary to insure public safety [and] aid in the reintegration of the inmate into the community.' And the board imposed such a necessary condition—allowing residential searches by Toliver's parole officers 'with or without a search warrant and with or without cause'—in the parole agreement he signed.

. . . .

"Toward that end, when we evaluate Toliver's individual privacy interest, we readily conclude he had actual notice pursuant to the agreement—which he signed—that he was subject to suspicionless residential searches by his parole officers as a condition of his parole. See *Samson*, 547 U.S. at 850 ("'The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence.'"). The signed parole agreement alone can be enough to uphold the parole officer's suspicionless search. See, e.g., [*Terry v. State*, 334 P.3d 953, 957 (Okla. Crim. App. 2014)] (holding 'resolution of this claim rests on Terry's diminished expectation of privacy dictated by the terms of his own parole agreement'; '[w]hile Terry enjoyed the benefit of parole, he was required to suffer the burdens he agreed to in his parole agreement, including being subject to search at any place or time').

"And as stated earlier, subsection (i) of K.S.A. 2014 Supp. 22-3717 gave the prisoner review board authority to add 'any condition' deemed necessary for public safety or to aid in reintegration. Under these circumstances, Toliver did not have a legitimate expectation of privacy. By contrast, the State's interest in supervising parolees to prevent recidivism and promote reintegration is substantial. See *Samson*, 547 U.S. at 853. Therefore, the suspicionless search of Toliver's residence did not violate the Fourth Amendment." *Toliver*, 307 Kan. at 956-58.

Against this backdrop, we can return to Harbacek's case. Unlike in *Toliver*—where our Supreme Court evaluated K.S.A. 2014 Supp. 22-3717(k)(2)—the subsection of the statute at issue here is K.S.A. 2020 Supp. 22-3717(k)(3). The first portion of that subsection states: "Parolees . . . are, and shall agree in writing to be, subject to searches of

9

the person and the person's effects, vehicle, residence and property by any law enforcement officer based on reasonable suspicion of the person violating conditions of parole or postrelease supervision or reasonable suspicion of criminal activity." K.S.A. 2020 Supp. 22-3717(k)(3).

There are a few pertinent differences between K.S.A. 2020 Supp. 22-3717(k)(2) and K.S.A. 2020 Supp. 22-3717(k)(3). First, K.S.A. 2020 Supp. 22-3717(k)(2) applies to searches or seizures performed "by a parole officer or a department of corrections enforcement, apprehension and investigation officer," while K.S.A. 2020 Supp. 22-3717(k)(3) applies to searches by "by any law enforcement officer." Second, K.S.A. 2014 Supp. 22-3717(k)(2) did not plainly state that a parolee's home could be searched, a fact our Supreme Court acknowledged in *Toliver*. See 307 Kan. at 948 ("In response to the [Court of Appeals'] decision, the 2016 Legislature amended K.S.A. 22-3717(k) to explicitly allow suspicionless searches of a parolee's home."). K.S.A. 2020 Supp. 22-3717(k)(2) now allows searches of the "person and the person's effects, vehicle, residence and property." Third, K.S.A. 2020 Supp. 22-3717(k)(2) allows for suspicionless searches—so long as the searches are not arbitrary or capricious or done for the sole purpose of harassment— while a search under subsection (k)(3) must be "based on reasonable suspicion of the person violating conditions of parole or postrelease supervision or reasonable suspicion of criminal activity." K.S.A. 2020 Supp. 22-3717(k)(3). This difference is evident in both the language of K.S.A. 2020 Supp. 22-3717(k)(3) and the "Search" section of Harbacek's parole agreement, where the second provision states that Harbacek agreed to "[b]e subjected to a search of my person and my effects, vehicle, residence, and any other property under my control by any law enforcement officer based on reasonable suspicion of violation of conditions of post-incarceration supervision, or reasonable suspicion of criminal activity." Lastly, searches performed pursuant to K.S.A. 2020 Supp. 22-3717(k)(3) requires the law enforcement officer "who conducts such a search shall submit a written report to the appropriate parole officer no later than the close of the next business day after such search."

10

Harbacek acknowledges *Toliver* but argues that "K.S.A. 22-3717(k) specifically limits law enforcement's ability to search to situations where there is reasonable suspicion of criminal activity or a parole violation. It does not give law enforcement officers blanket authority to search anytime or anywhere they want to." This argument can be broken down into two inquiries: (1) whether the officers had reasonable suspicion of criminal activity or a parole violation; and (2) whether the officers had the authority to search Harbacek's residence.

To answer the first inquiry, it helps to explain what "reasonable suspicion" means in the context of a search of a probationer's or parolee's house. In *Knights*, the United States Supreme Court stated: "The degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." 534 U.S. at 121.

Drummond called the police after Harbacek allegedly kicked him in his collarbone. When the officers arrived at his residence, Drummond explained what happened and showed the officers the abrasion on his collarbone. Under the "Laws and Personal Conduct" section of his parole agreement, Harbacek agreed to "[o]bey all federal and state laws, municipal or county ordinances, including the Kansas Offender Registration Act." In the same section, Harbacek agreed to "[n]ot engage in assaultive activities, violence, or threats of violence of any kind, threatening or intimidating behaviors, or lewd and lascivious behaviors." Kicking Drummond in his collarbone violates these provisions of the agreement, which is evidenced by the fact that the State later charged Harbacek with misdemeanor battery under K.S.A. 2020 Supp. 21-5413(a)(2). Put differently, the officers had reasonable suspicion that Harbacek engaged in criminal activity or committed a parole violation.

11

Since the officers had reasonable suspicion, it must be determined whether they had the authority to search Harbacek's residence. As stated above, K.S.A. 2020 Supp. 22-3717(k)(3) gives law enforcement officers with reasonable suspicion the authority to search "the [parolee's] person and the person's effects, vehicle, residence and property." In the parole agreement, this authority is embodied in the "Search" section, where the second provision states that Harbacek agreed to "[b]e subjected to a search of my person and my effects, vehicle, residence, and any other property under my control."

Harbacek argues there needs to be a nexus between the alleged criminal conduct and the place to be searched and analogizes this situation to a search incident to arrest. He states in his brief that K.S.A. 2020 Supp. 22-3717(k)(3) is silent about whether "suspicion of any criminal activity or parole violation gives law enforcement authority to go to the parolee's residence and search for evidence of any crime or violation."

This contention essentially adds in a requirement not stated in the plain language of the statute. K.S.A. 2020 Supp. 22-3717(k)(3) explicitly states that law enforcement officers—with reasonable suspicion the parolee committed a parole violation or engaged in criminal activity—have the authority to search "the [parolee's] person and the person's effects, vehicle, *residence* and property." (Emphasis added.) Nothing in the statute requires any sort of nexus between the alleged parole violation or criminal activity and the place or thing that is searched. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *State v. Ayers*, 309 Kan. 162, 164, 432 P.3d 663 (2019).

Both subsections (k)(2) and (k)(3) contain the same introductory phrase: "Parolees and persons on postrelease supervision are, and shall agree in writing to be, subject to searches of the person and the person's effects, vehicle, residence and property." K.S.A. 2020 Supp. 22-3717(k)(2), (k)(3). It stands to reason that because the police officers had

12

reasonable suspicion of a parole violation and criminal activity, the officers had the authority to search Harbacek's residence just like his parole officer could have done.

Moreover, the alleged parole violation and criminal activity took place inside the residence. Harbacek tries to distance himself from that fact by stating that "[b]y the time the Sergeant called the parole officer, Harbacek was no longer in the residence and at the very least was in the patrol vehicle on the way to the jail." This argument is unconvincing and somewhat dubious. There is nothing in either subsection authorizing a search that would require the search to be limited if the parolee is standing outside the residence.

Under the totality of the circumstances approach announced in *Samson*—and used in *Toliver*—the parole agreement and the authorizing state law impacted Harbacek's expectation of privacy. See *Toliver*, 307 Kan. at 957. Our Supreme Court in *Toliver* "readily conclude[d] he had actual notice pursuant to the agreement—which he signed—that he was subject to suspicionless residential searches by his parole officers as a condition of his parole." 307 Kan. at 958. Harbacek had actual notice under the parole agreement that he was subject to residential searches by law enforcement officers who had reasonable suspicion of a parole violation or criminal activity. The officers who searched Harbacek's residence did not violate his rights under the Fourth Amendment or the Kansas Constitution Bill of Rights, section 15.

This conclusion does not resolve the second issue raised by Harbacek in the case. The second portion of K.S.A. 2020 Supp. 22-3717(k)(3) states:

> "Any law enforcement officer who conducts such a search shall submit a written report to the appropriate parole officer no later than the close of the next business day after such search. The written report shall include the facts leading to such search, the scope of such search and any findings resulting from such search."

13

Here, the officers performed the search on January 23, 2021, but they failed to submit a written report to Richards until January 29, 2021. The officers failed to submit the written report within the allotted timeframe, a fact the State concedes. The officers' failure to comply with this portion of the statute served as the basis on which the district court suppressed the evidence during the preliminary hearing. At the end of the hearing on the motion for reconsideration, the district court reasoned the failure to comply with the statute warranted suppression because "there's no other recourse for the defendant for the law enforcement officers not complying with the statute, not complying with the law." The district court also reasoned that the violation was not merely a procedural component of the statute, and the State presented no evidence that was the Legislature's intent. The State disputes this conclusion.

The State argues the district court erred in suppressing the evidence because the search did not violate Harbacek's rights under the Fourth Amendment or the Kansas Constitution Bill of Rights, section 15. Instead, the failure to comply with the reporting requirement in K.S.A. 2020 Supp. 22-3717(k)(3) violated the statute. Relying on *State v. Robinson*, 303 Kan. 11, 121, 363 P.3d 875 (2015), *disapproved of on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017), the State contends that application of the exclusionary rule in such a situation does not "inevitably follow unless the [L]egislature has enacted such compulsory remedy."

In *Robinson*, "members of the Lenexa Police Department (LPD) traveled beyond the Lenexa city limits to conduct warrantless searches and seizures of trash left for collection outside Robinson's Olathe residence," and Robinson argued the evidence derived from the trash pulls should have been suppressed because the LPD conducted the investigative work outside its territorial jurisdiction. 303 Kan. at 118. To resolve the issue, our Supreme Court discussed K.S.A. 22-2401a(2)(a), the statute that outlined where law enforcement officers employed by a city may exercise their powers. Neither party disputed the fact that LPD officers conducted the trash searches beyond their

14

territorial jurisdiction, though that did not determine the issue. Instead, the pertinent question was "whether they were exercising their powers as law enforcement officers in doing so." 303 Kan. at 119.

Our Supreme Court eventually concluded the officers were exercising their powers as law enforcement officers under K.S.A. 22-2401a when they performed the trash searches. Consequently, the officers violated the statute in doing so. Having made such determination, our Supreme Court turned to the appropriate remedy for the violation. 303 Kan. at 120-121. After acknowledging that the LPD officers' conduct involved searches and seizures carried out in violation of K.S.A. 22-2401a, our Supreme Court pointed out that Robinson challenged the search "based on a violation of state statute, not the Fourth Amendment to the United States Constitution or § 15 of the Kansas Constitution Bill of Rights. Thus, application of the exclusionary rule does not inevitably follow unless the [L]egislature has enacted such a compulsory remedy." 303 Kan. at 121.

Our Supreme Court then explained that K.S.A. 22-3216(1) allows defendants to move for suppression of evidence seized in violation of law, but the statute does not compel district courts "to grant that remedy for any search conducted in violation of state statute in particular." 303 Kan. at 121. Next, the court assessed whether the Legislature intended to create individual rights or remedies under K.S.A. 22-2401a and concluded it did not. As a result, our Supreme Court found that suppression was not a remedy available to Robinson. 303 Kan. at 121-22. Our Supreme Court also stated:

> "In so holding, we do not suggest exclusion of evidence is never a remedy available for a search or seizure conducted in violation of state law. However, where a search is conducted in violation of state statute only and the statute violated does not vest defendant with an individual right, does not contemplate exclusion of evidence as a remedy, and the violation results in no cognizable injury to defendant's substantial rights, such a remedy is unavailable." 303 Kan. at 122.

The district court in this case is correct that the statute fails to mention any sort of remedy for the failure to follow the reporting requirement. Accordingly, that portion of the statute does not contemplate exclusion of evidence as a remedy. Similarly, violation of the reporting requirement does not result in a cognizable injury to Harbacek's rights. The reporting requirement does not vest Harbacek with an individual right. See 303 Kan. at 122.

While *Robinson* is persuasive, there is other persuasive analogous precedent. In previous cases, our Supreme Court has discussed whether the word "shall" makes a statutory provision mandatory or directive. See, e.g., *State v. Raschke*, 289 Kan. 911, 921, 219 P.3d 481 (2009). In *Raschke*, our Supreme Court stated:

> "[T]he following factors are among those to be considered in determining whether the legislature's use of 'shall' makes a particular provision mandatory or directory: (1) legislative context and history; (2) substantive effect on a party's rights versus merely form or procedural effect; (3) the existence or nonexistence of consequences for noncompliance; and (4) the subject matter of the statutory provision." 289 Kan. at 921.

As our Supreme Court noted in *Toliver*, "the 2016 Legislature amended K.S.A. 22-3717(k) to explicitly allow suspicionless searches of a parolee's home." 307 Kan. at 948. Similarly, the Legislature amended subsection (k)(3) of the statute to also allow for law enforcement officers to search parolees' residences at the same time. L. 2016, ch. 100, § 1. But it appears the Legislature added the reporting requirement in 2012. L. 2012, ch. 70, § 2. Research does not reveal any explanation for adding the reporting requirement.

According to the rationale in *Raschke*, the law enforcement officers' failure to provide a report did not have a substantive effect on Harbacek's rights. See 289 Kan. at 921. Instead, the officers had to report the conduct so Harbacek's parole officer would know if the law enforcement officers found anything the parolee officer needed to know

16

when searching Harbacek's residence. In *State v. Deavers*, 252 Kan. 149, 167, 843 P.2d 695 (1992), our Supreme Court stated:

> "In determining whether a legislative provision is mandatory or directory, it is a general rule that where strict compliance with the provision is essential to the preservation of the rights of parties affected and to the validity of the proceeding, the provision is mandatory, but where the provision fixes a mode of proceeding and a time within which an official act is to be done, and is intended to secure order, system, and dispatch of the public business, the provision is directory."

See also *State v. Holt*, 298 Kan. 469, 476-77, 313 P.3d 826 (2013) (discussing the general rule from *Deavers* when evaluating the second and third factors from *Raschke*).

Here, the reporting requirement of K.S.A. 2020 Supp. 22-3717(k)(3) fixes a time within which law enforcement officer need to submit a written report to a parole officer, and the intention behind doing so appears to be to "'secure order, system, and dispatch of the public business.'" *Holt*, 298 Kan. at 476. This supports finding the language of K.S.A. 2020 Supp. 22-3717(k)(3) directory. Similarly, the third factor from *Raschke* (the existence of consequences for noncompliance) also supports finding the language directory and not mandatory. As explained above, the statute does not state any consequence for lack of compliance with the reporting requirement. See *Raschke*, 289 Kan. at 921.

Under the fourth factor from *Raschke*, courts are to consider "the subject matter of the statutory provision." 289 Kan. at 921. The subsection of the statute in question is the only place that mentions a requirement that a written report to be submitted. See K.S.A. 2020 Supp. 22-3717(k)(1)-(3). There are no previous cases concerning the consequences of a law enforcement officer's failure to do so. If the language is directory, it is a reasonable conclusion that Harbacek was not prejudiced by the law officers' failure to submit the written report, given that the officers did not violate Harbacek's rights under

17

the Fourth Amendment to the United States Constitution or section 15 of the Kansas Constitution Bill of Rights. It seems illogical to conclude that an otherwise legal search would become an unreasonable search subject to suppression simply because the officers failed to submit a written report to Harbacek's parole officer in the allotted timeframe.

Additionally, as the State points out, our Supreme Court has concluded technical violations of statutes do not require suppression in other contexts. One such case is *State v. Baker*, 269 Kan. 383, 2 P.3d 786 (2000). There, the defendant submitted to a blood alcohol test that revealed a blood alcohol level of .199. But a district magistrate judge suppressed the test results because the police officer failed to check the appropriate box on the Kansas Department of Revenue Form DC-27, which certified that the police officer had probable cause to believe that Baker drove his vehicle while under the influence of alcohol. Following an appeal, the district court affirmed the magistrate judge's suppression of those results. The State then appealed the case to our Supreme Court.

Our Supreme Court stated that "[t]he only question presented is whether the officer's failure to check the appropriate box on the DC-27 form mandates suppression of the blood alcohol test administered by the officer." 269 Kan. at 384. In resolving the issue, our Supreme Court explained that the DC-27 form "was developed by the Kansas Department of Revenue as an aid to law enforcement officers, the Kansas Motor Vehicle Department, and an operator of a motor vehicle facing an officer's request that he or she submit to alcohol or drug testing." 269 Kan. at 385. The form covered two areas: notification under K.S.A. 1999 Supp. 8-1001 and certification under K.S.A. 1999 Supp. 8-1002. As our Supreme Court explained, the notification provisions of K.S.A. 1999 Supp. 8-1001 were mandatory, and the failure to provide notice resulted in suppression of the test results, though an officer did not have to state the exact words of the statute and substantial compliance would be sufficient. 269 Kan. at 386.

18

Our Supreme Court went on to differentiate between the certification requirements of K.S.A. 1999 Supp. 8-1002, which required officers to complete certain steps to certify testing results. Though the failure to properly complete the form affected how the State could satisfy foundational evidentiary requirements for the admission of a defendant's test results, the failure to properly check the boxes did not mandate suppression. 269 Kan. at 386-87. Our Supreme Court concluded that "[t]he failure of the officer in this case to check the appropriate box on the DC–27 form, certifying that he had reasonable belief that the defendant was driving the vehicle while under the influence of alcohol, does not automatically require suppression of the blood alcohol test results." 269 Kan. at 388.

More recently, this court decided *State v. Smith*, 46 Kan. App. 2d 939, 268 P.3d 1206 (2011). There, Smith appealed after the district court denied his motion to suppress the results of a breathalyzer test. He argued the district court erred because "the State failed to meet its burden of proof to establish that the law enforcement officers complied with the [Kansas Department of Health and Environment (KDHE)] protocol for administering the Intoxilyzer 8000 breath test." 46 Kan. App. 2d at 942. This court disagreed.

In doing so, this court explained that motions to suppress are typically "filed to address alleged violations of the Fourth Amendment to the United States Constitution and [s]ection 15 of the Kansas Constitution Bill of Rights that result from the actions of a law enforcement officer—either lack of reasonable suspicion or probable cause, or the absence of consent." 46 Kan. App. 2d at 942 (citing *State v. Fewell*, 286 Kan. 370, 376-80, 184 P.3d 903 [2008]). Smith admitted he agreed to submit to the breath test, and his motion to suppress failed to allege that the officers engaged in an unlawful search or seizure. This court thus concluded that his motion did not comply with the requirements of K.S.A. 22-3216. *Smith*, 46 Kan. App. 2d at 942. This court later stated "that an alleged failure of a law enforcement officer to follow KDHE protocol does not constitute the

19

violation of a constitutional right and is not legally sufficient to support a motion to suppress." 46 Kan. App. 2d at 942-43.

The State analogizes these cases to Harbacek's case, asserting that the officers' failure to submit a written report is a technical violation of K.S.A. 2020 Supp. 22-3717(k)(3) that does not warrant suppression. The argument is convincing.

In *State v. Ames*, 222 Kan. 88, 563 P.2d 1034 (1977), our Supreme Court dealt with technical violations in the context of searches and seizures. There, police officers recovered a revolver, a holster, and live ammunition when executing a search warrant at an apartment where Ames' wife lived. A jury later convicted Ames of unlawful possession of a firearm.

On appeal, Ames argued the search warrant should have been quashed and the evidence suppressed because there were a "great number of technical irregularities in connection with the execution and return of the warrant." 222 Kan. at 92. Specifically, Ames complained of these technical irregularities:

"(1) the return was unsigned; (2) the holster was not listed as an item seized; (3) the officer gave the gun to the district attorney without prior authority of the magistrate in violation of K.S.A. 22-2512; (4) no receipt for the items taken was given to the accused or filed with the magistrate in violation of K.S.A. 22-2512; (5) the date on the return was in error." 222 Kan. at 92-93.

Our Supreme Court rejected Ames' arguments. Part of its rationale for doing so stemmed from K.S.A. 22-2511, which states: "No search warrant shall be quashed or evidence suppressed because of technical irregularities not affecting the substantial rights of the accused." 222 Kan. at 93. Additionally, our Supreme Court explained that other cases had rejected the first four technical irregularities alleged by Ames and found the fifth irregularity to be purely technical. 222 Kan. at 93. The Ames court also relied on

20

*State v. Stewart*, 219 Kan. 523, 548 P.2d 787 (1976), *overruled on other grounds by State v. Fortune*, 236 Kan. 248, 689 P.2d 1196 (1984), which had previously found suppression inappropriate for an officer's violation of K.S.A. 22-2512. In *Stewart*, our Supreme Court stated:

> "The state concedes that the police officers did not comply with 22-2512 because the officer seizing the property failed to give to the person arrested a receipt particularly describing each item of property being held and by the failure of the officer to file a copy of the same with the magistrate before whom the person arrested was taken. We agree with the state that the intent and purpose of the statute is to provide reasonable safeguards for the care and custody of property seized from persons detained or arrested and subsequently utilized as evidence in criminal actions. Police officers should comply with the statute and under certain circumstances their failure to do so might well preclude the admission of seized articles into evidence at the trial. The failure to comply with the statute, however, does not as a matter of law prevent the admission of the seized articles into evidence where the articles are properly identified at the trial and where the evidence shows that the condition of the articles has not been altered and that they are in substantially the same condition as they were at the time they were seized." 219 Kan. at 527.

After reviewing *Stewart* and other cases, our Supreme Court in *Ames* concluded "that a warrant should be quashed and evidence suppressed by the district court only when the defendant demonstrates prejudice from a technical irregularity in violation of the rules of procedure governing the execution of search warrants." 222 Kan. at 94.

In this case, the failure to provide a report is a technical irregularity which did not affect an accused's substantial rights. Harbacek argues suppression is warranted based on the officers' violation of a statute. The officers' violation here occurred after the search was conducted. See 222 Kan. at 93. Our Supreme Court concluded in *Ames* that suppression was inappropriate because Ames could not establish prejudice from the

21

technical violations of the statute concerning the execution and return of a warrant. See 222 Kan. at 94.

It is hard to fathom how Harbacek was prejudiced by the late filing of the report. It would appear that the predominant reason for the filing of the report is to notify the parole officer if the search revealed any evidence that would support the filing of a parole violation and not for the purpose of protecting the rights of the parolee. In this case, the parole officer was informed of actions by Harbacek that could constitute a parole violation due to the officer's phone call to the parole officer the day of the event. Logic would also indicate that a parolee would not be prejudiced if the report was never filed in that the parole officer would be unaware of information that could be used for filing a parole violation. It follows that suppression would be inappropriate here because Harbacek cannot establish prejudice based on the officers' technical violations of searches under K.S.A. 2020 Supp. 22-3717(k)(3).

Neither the statute in question nor caselaw provide a clear answer for what should happen when law enforcement officers violate the reporting requirement of K.S.A. 2020 Supp. 22-3717(k)(3). However, in this particular case, the law enforcement officers' search of Harbacek's residence did not violate his rights, and their failure to comply with the reporting requirement does not merit the suppression of the evidence found. The district court's decision to grant Harbacek's motion to suppress is reversed, and the case is remanded for further proceedings.

Reversed and remanded with directions.